Case number 21-1075, Children's Health Defense, et al. Petitioners v. Federal Communications Commission and United States of America. Mr. McMillan for the petitioners, Mr. Schert for the respondent. You can remove the mask if you would. May it please the court. My name is Scott McCullough. I'm counsel for petitioners Children's Health Defense in four individual petitioners, Dr. Elliott, Ginger Kessler, Angela Sang, and Jonathan Mirren. Petitioners Kessler and Sang and CH member Barron each have two young children with debilitating RF-related conditions. CHD member has a daughter similarly affected. These kids' homes are the only relatively safe space for them. They could die if a facility authorized by the rule amendment, I'll get into an amendment in a minute, suddenly appears nearby. CHD appears in its organizational capacity representing almost 2,000 members who filed below. 823 of them also have RF-related disabilities. The FCC contends that these folks have no rights to be protected. They must helplessly witness their kids or spouse, like Mr. Mirren's wife, being tortured and then frankly exterminated. Those who suffer the same conditions, the adults, will suffer the same fate. We respectfully disagree. To put it simply, the Communications Act does not grant the commission the power to issue a license to kill. This court must vacate and remand. Now, to the rule. The rule in issue, and pardon me if I use an acronym, OTARD, that's the way it's always discussed at the commission. That's over-the-air receiving device. It's in 47 CFR 1400. The commission amended the rule, and we are challenging the amendment. Originally, the rule, and to this day it still does, preempt any state or local law which unreasonably restricts the placement or operation of these protected facilities. Under the old rule, people who own property or had a leasehold interest in property could place consumer-end devices on their property in order to receive either satellite TV service or fixed internet service. It had to be for their primary use. It had to be to serve tenants on the premises. Not exclusively, though. You just said it had to primarily be for serving tenants on the I don't know what percentage primarily was, but there could be some additional communication to another. Yes, the FCC usual term for that is called incidental use, and the rule did allow incidental use. That was in 2004, and the commission allowed people who had these consumer-end devices to put in additional consumer-end devices that could provide connectivity to others nearby. You get point-to-point, mesh-type service that could incidentally serve a couple of others, but it always had to be incidental, not primary. Now, the main change to the rule isn't necessarily, the biggest part of the rule is the type of equipment that is now allowed. The commission wants to downplay this, but the actual equipment that it now allows through the amendment is far more powerful equipment, whereas before it had to be consumer-end equipment, which could emit only pursuant to the much lower emission levels allowed for consumer-end or CPE, customer premise devices. Now, you can have a carrier come in, a private carrier, put in a very, very powerful antenna, much like a cell phone antenna, then a base station that can serve thousands of people with the antennas spreading in an omnidirectional manner out a mile or more. And so what the commission did was it allowed far more powerful equipment, and it removed the primary use requirement. Indeed, it flipped it. Now, the primary use can be to serve anybody nearby up to a mile or two out, however far the antennas go, so long as the use for on-premise customers is at least incidental. So they flipped that rule, and they allowed more powerful equipment. Now, what are our issues with the way that the commission approaches this? Before you get to that, I just want to ask a question on the and that is you have two of your members here, Elliott and Kessler, who had restrictive covenants in their properties or limitations in their properties that prevented either, I think, as to Kessler, the installation of antennas at all, and as to Elliott, at least anything for commercial use, anything beyond sort of personal use, maybe this incidental Yes. I'm sorry. I'm going to clarify my question is, and then I'm interested in what you have to say. My question is, with the change in the rule, what evidence is there that there's, as to Ms. Elliott and Ms. Kessler, that there is a substantial risk that there will be one of these antennas that they can no longer prescribe through their restrictive covenants on their homes in an area that's going to affect them? If I understand your question correctly, were you asking the extent to which the change in the rule will affect restrictive covenants? No. I get that those are displaced, but if they're displaced, it doesn't hurt them unless one of these antennas comes up near them. So what evidence is there in the record of a risk, a substantial risk, that now with those restrictive covenants no longer enforceable, that in fact antennas will come up near them in a way that will affect them? In the briefing, when the commission challenged the standing of the petitioners, as we explained, the petitioner, Hoffman, actually that's one of the declarants, Mr. Hoffman, already has a new OTARD, the new rule type antenna, right next to him. They had the service provider... He listed the two with restrictive covenants, Elliott and Kessler. What evidence was there for them where they live? Because communities are different, that this was going to happen near them. Based on the record before you and the standing evidence, we were not able to establish that one is near either of them. The rule, however, removes their restrictive covenant, right? I'm asking you to show that there is one. I want you to tell me how there's a substantial risk that there will be one. Well, the commission itself touted the extent to which this rule was going to be used. As it explains, Starry alone, almost a million customers, many other service providers will take advantage of this rule. There is clearly a substantial risk that one of these will show up unannounced, without notice, and thereby affect the taking of the restrictive covenant, right? Without notice? I beg your pardon? Without notice? Without notice. But does the company that is erecting the tower have to get permission from the FCC before doing that? There are no site-specific requirements. Right. And a lot of it depends on which frequencies are being used, some of which are fully licensed. If that is the case, then they have to get the interference. Essentially, it is all about the interference. The specific placement is not regulated by the FCC here, unless the tower gets so tall that it must be registered in order to protect against airlines. That's another question I have. It's 12 feet above the roof line, right? How do you measure the roof line? You've got a community, some of which have three-story houses, and others of which have one-story ranchers. They call them in Texas, too, I think. Which is the roof line? My understanding is it is the roof line of the specific house or building on which the structure will be built. And so if it is a three-story building, then the 12-foot exception for minimal local safety regulations would be 12 feet above the third story. On the single story, then it would be 12 feet above the single story. If it's 12 feet above, does that change the FCC's involvement in any way? I beg your pardon? If it's more than 12 feet, no matter how we measure it, how does that change, if at all, the FCC's involvement? Well, the 12-foot exception is very, first of all, it doesn't appear in the rule. The limited exception in one of its orders before this rule was changed. But what it basically allows is a very small amount of local safety regulation. They still cannot regulate placement. They still cannot require a permit. Indeed, before they can even enforce the safety regulations that the Commission touts in its brief, they have to have previously promulgated an ordinance that specifically listed which safety regulation. Every jot and tittle of it. The antennas that we're talking about are attached to houses or buildings? Is that right? Some of these can be attached to houses. Some of them can be freestanding towers in a yard, much like the images that we gave you from Mr. Hall. I want to pick up on one other question, or one other assertion that you made, that there doesn't need to be any notice. The rule we're talking about is on page GAA-23, right? Yes. It doesn't say anything about preempting notice, does it? Well, it does not require notice. There is no specific requirement for notice. If there's a notice requirement in a homeowners association to build any kind of structure or a zoning rule in a town or a county, or even a statewide requirement, where is it in the rule that would preempt all those notice requirements? The Commission has declared, and I'm sorry, I don't have a site for you, but I can provide it post-argument. The Commission has, in fact, already preempted some local ordinances that required notice for various things. There's partial preemption. Maybe when the Commission says we preempted, they're not erasing the statute or the ordinance. All they're doing is asserting the authority that they have through the regulation and statute. And if there's nothing in there that preempts a notice requirement, forget about citing a notice requirement. I don't see where you get the idea that notice is preempted. And I must say that on page 38 of the Commission's brief, they make the assertion, too, and I don't find any support for that at all. Well, the rule is not expressed in this regard, but in the past decisions where the Commission has said, even under the old rule, when somebody had satellite dish, for example, that localities could not require notice, the Commission said that it was an unreasonable restriction because it impeded the ability and delayed the ability to install. Therefore, I thought they had only preserved safety regulations. Is that right? The only thing they preserved was safety regulations. This rule, according to some of the Commission precedent, allows a locality to impose a very limited amount of safety regulation. Only safety. Only safety. Only basically the safety codes, electrical code, building code. And only to the extent that notice part of the safety code. Building code, electrical code, fire code. Is notice part of the safety code? Sometimes it is, but my understanding and belief is that the Commission would say that this notice requirement. But we don't know that, and it's not on the faces. This is a facial attack on the regulation amendment on page JA23. And there's nothing on the face of the regulation, and you admit this candidly, that preempts anything other than citing. It even preempts citing. All that it allows is a minimal amount of safety regulation in the form of electrical and fire code. I don't... Where in the... Go to page JA23, and tell me what language has that effect? It does not appear in the rule, similar to the 12-foot exception. Right. But the Commission has in the past, under the old rule, preempted municipal regulations that tried to... If the old rule does that, and I don't know whether it does, then what's that got to do with the amendment that you're attacking? Because of the new equipment that is allowed. With this new, very powerful equipment that goes very much further and impacts far more people. There is a whole new class of people who, pre-amendment, would have received notice under their local zoning code. Or would have been protected by a restrictive covenant. Now, with the change, all of that local protection goes away. The Commission will contend that... Because they're now commercial use. Yes, including the commercial use, and including the no wireless towers. I wanted to clarify, I'll give you some time for rebuttal. But another thing that you said in response to Judge Randolph's questions on what kind of notice to the FCC is required, you said if it's a certain level of frequency, they may have to be licensed. But I had understood from your brief that, I don't know if it was some or many of these antennas, some portion of these antennas would not require notice to the FCC, or a license from the FCC, at all. That is correct. The so-called unlicensed frequencies. So there's no notice to the FCC that they're coming in. That is correct. And the notice provisions, if we take FCC at its word, that's its position, those are also pre-empted. So that's the source of your concern about lack of notice. Absolutely. As a consequence, people will not know when one of these is about to show up, so that they can deal with it however they otherwise would have. Nor is there any ability to find where they are in order to ensure that their emissions, even under the new rule, are FCC compliant. There's simply no way to find out where these things are, where they will be when they're coming. And the petitioners here, the only way they will know is when their children begin to get sick again, after they already fled to find somewhere safe. My colleagues have any more questions? All right. Thanks. We'll give you some rebuttal time. Thank you. Good morning. May it please the Court, Bill Sherr on behalf of the Federal Communications Commission. I'd like to start by addressing Judge Millett's question about standing. You asked whether there was any showing of substantial risk of harm in connection with the private restrictions. And our point in our brief is basically that, in order to make a determination about whether there's a substantial risk under this Court's case law, the Food and Water Watch case, the public citizen case, you have to be able to compare the risk under the new rule to a baseline of what the old rule, what the risk was under the old rule. And petitioners, in their briefing, don't acknowledge the scope or history of the old rule and that it covered hub or relay antennas. What was primarily? It had to be primarily for customer use. And the FCC made the considered decision that that restriction was a barrier to development of these types of communications abilities. Significant barrier. Correct, Your Honor. And that eliminating that would open up development and expansion of these capabilities in very important ways to allow better access in remote areas, areas that have been underserved to meet the, I think you had numbers about the exploding demand for this. So it seemed to me the FCC itself anticipated that this was going to produce substantial proliferation of these antennas. Is that, am I incorrect in understanding that? No, I think you're correct, Your Honor. The rule previously. Tenfold, twentyfold? How much more are you anticipating? I don't have an estimate. I think that the Commission certainly expected that it would. Lots? Lots, that it would contribute. Lots and lots. I think that the principle. We've got 5G, we have to do this, right? We've got to get these things out there. Right, Your Honor. And I think that the Commission anticipates that by removing uncertainty about the scope of the old rule and the meaning of the primary restriction. Which is uncertainty, the primarily restriction, the primarily customer use restriction, not just, I mean, it's getting rid of that. Your Honor, I think that the, I mean, the use, the restriction before was that the antenna not be primarily intended for use as a hub. So there is no Commission case law about. That it be primarily used for customer service on that area. Yes. That's a different formulation. There's, it's absolutely true that the Commission removed the primary use restriction. And so antennas are no longer required to be primarily intended for customer use. There remains a restriction that each antenna that's on our premises has to be used by the customer to receive a signal. I'm a little bit confused here. We're talking about antenna that are designed to receive signals. Are we also talking about antenna that transmits signals or relay signals? Yes, Your Honor. The part of the reason for the Commission's decision was that these antennas, as wireless technology evolves, are multipurpose. So the same way that a personal computer can be used as a word processor, you know, as a gaming device to watch video, these antennas increasingly have multiple functions and they can be used to receive and they can be used to transmit and they can be used to relay. And a big part of the reason that the Commission eliminated the restriction was because it concluded that it was obsolete, that it didn't make sense when you're talking about a multiple feature antenna. And the function is what? A video and what else? For purposes of the rule change, the rule change covers antennas that are used for broadband only. So it's fixed wireless that's being used for wireless internet, not for voice, not for mobile, but specifically for broadband. And the Commission explained that the broadband only antennas, by covering those, it's serving the original purpose of Section 207 in which Congress directed the Commission to adopt this rule because customers increasingly stream video programming over the internet. And the rule was originally meant to increase consumer access to video programming. What do we know about the likely strength of these antennas? Your friend on the other side makes at least a plausible argument that when you move from an antenna that's primarily receiving for use on site by the building owner to antenna that are primarily transmitting and incidentally used for local use, the new antennas will likely be much stronger. Your Honor, I can't speak to what the power of the antennas will be. The rule change was to eliminate the primary use restriction, but the Commission did not change any of the other restrictions of the rule. So it continues to require that this equipment be used by customers to receive service, and it continues to place size restrictions on the antennas. So my understanding, generally speaking, is that fixed wireless antennas operate point-to-point and point-to-multipoint. They often operate on higher frequencies where the signals don't propagate very well, and they have to be located relatively small distances from one another. So my understanding is that they generally don't operate omnidirectionally, and they generally don't have reaches of one to three miles, but the Commission's rule change didn't address the power of the devices. But again, my understanding is that what we'll see, what the Commission anticipates seeing is more rapid deployment of the kind of antennas that would have been covered. Is there any indication that there's some opportunity for local communities to have regulations, not for the purpose of regulating the frequency or regulating the intensity of the signal, but because they're ugly? And we don't want them in our town because they, for aesthetic reasons. Your Honor, the rule before the rule change and the rule after the rule change prohibits unreasonable restrictions on antenna deployment, on placement. And unreasonable means it completely prevents the placement of antenna or delays it or increases its costs. And so there is Commission case law, there are Commission's decisions interpreting that reasonableness standard. And that standard leaves room for communities to regulate with respect to aesthetic standards, with respect to the site of an antenna on a customer's property, with respect to radio frequency radiation safety, as long as the restrictions are within the Commission's limits. The restriction is that they not be unreasonable. So for instance, the Commission has said that a requirement that antennas be painted so that they blend in with their surroundings can be reasonable so long as it doesn't increase the cost of the antenna to such an extent that it's unaffordable or prevent its placement. Is it true that an antenna pursuant to this amended regulation can be erected without any notice to the Homeowners Association? Your Honor, with respect to notice, the Commission has held that under the rule itself, I'm leaving aside the safety exception, but with respect to the rule itself, the Commission has held that prior approval requirements cause unreasonable delays. I'm not talking about prior... But a notice requirement may be... It is a phenomenon that I think I'm aware of and I'm not testifying here. What often happens is that when the Homeowners Association gets wind of a tower going up, even though that association has no authority to approve or disapprove the tower, they can take action by mobilizing people and petition whoever has the authority under the First Amendment or right to try to stop the project. So regardless whether they have the authority to stop it, all I'm asking is how are they going to know the tower that's going up, that there is a tower that's going up? If the safety exception to the rule applies... I'm not talking about safety. Aesthetically. The aesthetics... Under the rule, there is room for aesthetic standards. The Commission in its case law so far has ruled that prior approval requirements, so notice to the community prior to the erection of an antenna or a tower, cause unreasonable delay. So just notice is a form... Your example just said prior notice is prohibited. Prior notice under the Commission's case law has been prohibited, except with respect to the safety exception. So if I want to put up a tower or a mast on my property to support an antenna that's covered by the rule and it's more than 12 feet above the roof line, then the safety exception would allow for... As long as they're within, as long as it's not... It's 12 feet. I think there was more than 12 feet. So if it is within the... No notice. Correct. No prior notice, but notice requirements after the fact would be acceptable. That's not... Is that a result of the amended rule or is it... No, Your Honor. It is not a change in the rule. The Commission was very clear that it didn't change any aspect of the rule other than this primary use restriction. That is a interpretation. Yeah, but the volume of these things they're going to put up and the power that they're using are going to expand enormously, right? What they've said is under the old rule with the requirement that it be used primarily for customer usage, they've been able... With their homeowner restrictions, they've been... This is their allegations. I'm just repeating them. They've been able to control it and prevent it being put in. Now that there is no... And now that's gone and that's preempted and these can come in without any notice. First of all, Your Honor, two things. I think that there is no evidence in the record and there's nothing in the Commission's order to indicate that significant increases in power of the devices are going to be a result of this rule change. The number of them surrounding them, they don't need more power. It's the number of them surrounding them. Even one that's not that powerful that's right next door, which before they could prohibit and now they can't even have notice of can affect them. So put aside the frequency. I'm assuming the ones here that the power is the level it's unlicensed. Your Honor, I don't think it's true that before they could contest, even under the private restrictions, that they could contest the placement of an antenna based on exposure to radio frequency energy from the antenna. Based on commercial usage. It's for commercial usage. It's not primarily for the use of the homeowner. They can contest on that ground. Your Honor, under the prior rule. They could, right? They could, at least on the record. We don't know more than what the record is in their affidavits. They have these restrictions that limited one limited antennas altogether. No, Your Honor. I think the answer is no. So even if an antenna prior to the rule change was intended primarily for commercial use. So it wouldn't be covered by the rule. If a homeowner's association wanted to prevent the arrest of an antenna on the basis of radio frequency energy from that antenna. No, they don't. I'm going to say this again. They want to prevent. Their homeowner restriction prevented it because they didn't want commercial uses of these devices on their property. Of things erected on the property for commercial purposes. That's what they prohibit. That's what is now preempted. Don't talk to me about radio frequency. I'm talking about commercial usage. I don't believe that the private restrictions that are in the record speak specifically to commercial usage. If I read it differently, just take it as a hypothetical. That would be preempted. Yes, absolutely, Your Honor. And no notice. I mean, it's not a license level. Yes, that's correct. That's correct. How do you? Now I just have a practical question. Take your radio frequency exposure limits that you have. And as more of these antenna are out there, if they're multiplied, let's just say they're multiplied by five as a result of the rule. Then exposure limits would increase. No, Your Honor, the exposure limits. I don't mean the limits would increase what someone is exposed to. If I'm exposed to one antenna, there's a certain amount if I have. This is very hypothetical, but if I have antenna on all four side of me, all of them doing it, what I'm exposed to is going to increase. It may not exceed your limits, but it's going to increase the amount of exposure. That's not necessarily true. The amount of exposure varies according to power, to the frequency, to the proximity, to the equipment. The commission's four times exposure is not more than a single exposure is what you're telling me. If I have if I have a circle of these antennas surrounding me, all operating simultaneously at an unlicensed level, I am not exposed to any more radio frequency than if there was just one. For purposes... Is that your answer? I can't. I can't. I don't want to speak to that. I don't think that I don't know. I don't want to answer that, but the answer under the commission's radio frequency exposure limits is that the limits create... I'm asking you a fact question about how these things work. If I'm surrounded by six or seven, however many it takes to get around me, am I exposed to more? It may still well be within the limits. Yeah, possibly. But it would have to be within the limits. No one's... I'm not questioning your limits here. What I'm asking is just the fact question. They have... There's more. I would assume so, Your Honor. I'm not an expert or an engineer. I can't make that assumption on the basis of physics. I mean, if I have 15 objects that are transmitting waves at a certain decibel, it doesn't mean that it's 15 times louder than it would be if only one of them was transmitting. So I'm not sure that's... And I don't know either, Your Honor. And I just want to make the point that the commission's radio frequency exposure limits govern radiation from multiple sources. I'm just asking. What I'm trying to figure out is if there's no notice to the FCC of where these things are, how does someone figure out if the exposure limit has gone up or not? I don't want to use the word limit. What someone is exposed to has increased, even if it's still within, you know, your range is here and they're still here. The service providers are responsible for compliance with the commission's radio frequency exposure. How do they comply if they don't know who else is putting this up? Service providers and all carriers have a responsibility under the commission's radio frequency exposure limits to maintain levels that are within the commission's limits, even for multiple source devices. So if you're standing in a spot and there's 10 different sources of radiation, all of the carriers and service providers that are contributing to that are responsible to ensure that... How do they do that if they don't have, if there's no notice anywhere as to where these other antennas are? It could be in someone's backyard behind a tree. The provider would have to ensure that installation was consistent with the radio frequency exposure limits in order to be able to install it in the first place. And notice requirements are acceptable as long as they're not higher. An individual one will not exceed the limit, but if the collective impacted... I believe, Your Honor, that a service provider would be responsible before installing the antenna to ensure compliance with the radio frequency exposure. How would they do that if there's no notice of these other ones? That's, this is the practice. Well, the service provider has to work with the customer. The customer has exclusive control of the property. And so it knows where it's putting the antenna and it would have to ensure that by putting the antenna there, it wasn't creating exposure risks beyond the commission's limits. So if a tower goes up and I'm the next door neighbor and I think it's ugly, what is my recourse? That is, you know, I took a look at the zoning restrictions and they say, you know, no tower shall go up without approval of the local zoning commission. So, so what's my recourse as a neighbor that I don't want to have to stare out of my picture window at some ugly tower? Well, Your Honor, again, the commission didn't change anything about the rule except for the primary use restriction. And the rule allows for reasonable restrictions. Do I go to the FCC to complain? Yes. Well, if you believe that there's an issue about coverage of the, whether the rule covers a particular device, there's a declaratory ruling process with the commission and courts to determine whether something's covered by the rule. But you would, you could go to your local zoning authority and you could say someone's put up a mask with a supporting antenna and, you know, it's ugly and I believe, and I want it removed. And then it would be up to the local authority to decide whether that was something that needed to be removed or whether it was something that was subject to reasonable restrictions. And someone could go to the FCC to obtain a decision about whether... You're not here saying that a local zoning board could order antennas removed as part of their aesthetic, are you? Are you saying that local zoning commissions retain the authority to order these antenna removed because they're ugly? If it's a reasonable... Is it a reasonable? You told me unreasonable things are things that increase costs or prevent it from happening. So now you're suggesting to Judge Randolph that maybe they could order them removed. If that's a very important concession, if that's what you're saying, could it be removed, ordered removed by a local board without any preemption, removed because of aesthetics, not safety? No, I think not, Your Honor. I think they would have some authority to... That's not an answer then. I think that I'm out of time, Your Honors. Are there any other questions? Thank you. Okay, Mr. McCullough, we'll give you two minutes. Thank you, Your Honor. I'd like to address two issues with my remaining time. The first is a standing issue on Food and Water Watch. We do not have to show an increased risk of harm. And that is because this rule regulates us directly. The Food and Water Watch case it deals with people who... Where there's a rule that regulates a third party and those who are claiming harm have to show an increased risk of harm because of this third party activity. If you look at this rule, it regulates the petitioners and the local jurisdictions directly. It does not say these providers can just put up a towel. It says there can be no restriction. And that is what preempts all of the laws and rules and contracts that we're talking about here. Food and Water Watch doesn't apply to us. Sorry, how does that regulate the individual petitioners directly? For example, if we have... You're a neighbor to someone who was allowed to put up an antenna. That might certainly be a cause for concern, but it's not a regulation on the neighbor. It is if I have a restrictive covenant because that's been deemed to be an unreasonable restriction and it goes away directly by the rule. The rule operates directly against the petitioners and state and local jurisdictions. Now, let's talk about... So your best theory of standing is preempting the contract rights or the covenants? Directly takes away your contract rights and there is no right to obtain a full recovery under the Tucker Act. Because Randolph, I know that's one of the issues that you've addressed. How does it take away contract rights? Well, a restrictive covenant is a form of a contract along with being something that you have as... Oh, I see what you're saying. Yes. Now, let's talk about what's really going on here in the commission... I'm gonna give you one sentence because your time is up. So one sentence. We're talking really, really ugly, powerful intent is authorized by this rule. Instead of a porch light, we're talking about stadium lights that emit out to a mile. Instead of a TV speaker, we're talking about a large rock band playing in a stadium with people who can hear it out to a mile. The old rule dealt with consumer end equipment, not very powerful, but lower emissions. This rule directly allows for carrier base stations with up to three times the power level. Starry plans to put up to three base stations at each location, serving 12,000 households within a one mile, 350 mile direction. They could not do that under the old rule. All right. That is a material change. Thank you very much. The case is submitted.
judges: Millett, Katsas, Randolph